to deal with. The first one is going to be Jane Orie v. Sec PA Department of Corrections. We're ready to go ahead and keep pushing on through on that, although we may take a break after this one or the next, we'll see. So we'll ask counsel for the parties to come forward. Please proceed. May it please the court. My name is William Costopos, and I represent Appellant Jane C. Orie. I respectfully reserve two minutes of rebuttal time. Jane Orie, your honors, was the second highest ranking Republican senator in the Commonwealth of Pennsylvania, known as the Senate whip. She was charged in 2009. We're familiar with the facts. The defense to the charges was not in the crimes code, but it was very straightforward. Before you before you get into the merits, let's I take sort of your main appeal to be to this. The Ethics Act vagueness issue. Start, if you would, with the assertion that we don't have habeas jurisdiction because she wasn't in custody for that conviction. She got a no further penalty sentence. And so because she got a no further penalty sentence, there's no basis for her to complain here that she's wrongly in custody for it because she was never in custody for it. Judge Jordan, that issue of whether she was in custody is limited to one of the three very significant constitutional questions that this court has asked Jane Orie to address. That procedural issue goes only to the vagueness issue whereby we challenged the conflict of interest statute. And on that procedural issue of whether she was in custody, she's still in custody. But because Judge Manning provided in his order after he gave her 30 months to 10 years, that no further penalty will be imposed on the conflict statute because of the sentence I've already given her, which he was happy with, having given her 30 months to 10 years. Right. But our case law doesn't say you can look at the overall sentence that she's going to serve. The case law says you got to look at the count of conviction that's being addressed on habeas and ask whether the defendant is in custody for that. Isn't this who seems to say that pretty clearly? What? Why is it that since separate penalties were given for the counts of conviction and on this count, it was a no further penalty. Why is it that we have you think we have jurisdiction to address the constitutional vagueness argument? There are two answers as to whether we meet that procedural hurdle. And one is after Judge Manning said no further penalty is imposed as to the remaining counts by reason of the sentence imposed here. He did go on to say that the sentence in the aggregate is not less than 30, nor more than 120 months. And the Third Circuit court case that I was referred to, United States versus Jeffries. That court also used the hot button word aggregate. And if you say to me, counselor, we can distinguish the sentence in the Jeffries case from yours, then my second answer is as follows. Every conviction that flowed in this case that put her in jail for 30 months, the 120. Was predicated upon the conflict of interest statutes that she was brought and convicted of, for which she received no further penalty. But the 30 to 120 months emanated from the conflict of interest statute was the Senate Quenon. I'm not and I apologize, Mr. Costopoulos, because I'm not I'm not understanding how that gets us past the jurisdictional hurdle. Well, you can you can say that the underlying problem for her other convictions has to do with this, this particular account. But there isn't any kind of general emanations rule, is there? There's you either got a sentence of incarceration for that count or you didn't. That's a one or the other kind of a thing. And the and this the state record indicates no further penalty on that count. That's how it was upheld in the state courts. So I'm just not following your argument. Well, I believe you're following it. I don't know that you're buying into it, but. On of the three constitutional issues I've been asked to address, this only goes to the vagueness of the statute. And if this panel says, counselor, we do not feel that she was in custody on the conflict of interest statute. Therefore, you don't have Jewish. We don't have jurisdiction to address it on the merits. Then I'll move on. OK. All right. Now, the other issue that this court asked to address. And if this panel agrees with me, you don't have to go any further. You don't have to go to the merits of the voidness issue, which we have the procedural question. You don't have to go to blowing out the centerpiece of my case when Stephen McNett was not allowed to testify. The first issue I would ask this court to address on the merits is the double jeopardy claim. And on that. Speak, if you would, to the manifest necessity piece, right? Yes. That seems to be a hotly contested aspect that that it came to light late that your client. And she was accused and later convicted of this, had fabricated evidence. And so fabricated evidence was in front of the jury. What is it? Is a trial court supposed to allow fabricated evidence to figure into a jury's decision making and do nothing? Or is there some necessity for a court to act when it learns that there's been a fraud on the court and on the jury? The fair question, Judge Jordan. But the answer to that question is to be driven by the facts of this case. And I'm not asking this court to come up with some universal ruling of when manifest necessity can be declared in a scenario such as this. This case went on for 30 days. Our case was. Premised upon January's testimony and approximately 50 written directives to our chief of staff in her handwriting in ink. Try telling her to keep certain things separate. Right. And I'll repeat what Judge Beavis said. We're. You can trust that we have familiarized ourself with the facts. Well, then let's go to the mistrial. We're called into court after the jury goes out to deliberate. The authenticity of those 50 documents is before the jury. There are three documents put on the screen while the jury is deliberating. And the one document bore a superfluous signature of the chief of staff. Which was a notice to a staffer as to what her rules were. And the staffer testified that she signed on the dotted line acknowledging those rules. Are you are you suggesting that the that the trial court here acted improperly because there wasn't enough evidence to conclude that there had been a forgery or a tampering with the documents? There wasn't enough evidence. There wasn't any evidence as to who did it. There wasn't any evidence as to when it was done. And most importantly. Well, hold on. If you assume those last two points are right, that nobody knows who did it or when it was done. But assume that it was enough evidence for the court to rightly say. These are tampered with. These are not true and accurate representations. These are falsified documents. No matter who did it. Is the court not obligated to do something to see that the jury's processes are not perverted by falsified evidence at that point? Not in this case. And you say, why not, counselor? Because that document that I'm referring to that was on the screen that you're asking me about. January was asked about when she took the witness stand. I mean, it was pretty clear that that signature wasn't authentic. It was on a crooked line where it said witness. The S was missing. But the fact remained that the staffer acknowledged getting that notice. And January was cross-examined on that very document and they put it on the screen. OK. So the fact that they put this document up that allegedly has Jamie Pavlots, if I'm saying the woman's name right, falsified signature on it. How does that speak to whether once it's determined that this is false, it does or doesn't create a manifest necessity? For for action to declare mistrial because. Whether it's false. Or not. In this case. Was for the jury. That's where it mattered. That wasn't the trial court's call. That wasn't the Commonwealth's call. I know what they believe. They believe Jamie Pavlots was telling the truth and Jane or he wasn't. And what we took to the jury and we both put our best case forward. My case was Jane or is telling the truth. And Jane, Jamie Pavlots not. So this particular one document. Which was arguably non nefarious. From an unknown date and time and place. That didn't add anything to the prosecution case or take anything from the defense. Well, at that point, the court actually said, look, we could have some curative instruction. I mean, it sounds like what you're saying is they should have been left with the jury. But one of the things that the court offered to the client was to say, we can we can bring the jury in here and and identify this problem. So that they're not laboring under a misapprehension and let them keep deliberating. And the response that was on your side was we'd rather have a mistrial than that. The requested option of the Commonwealth reads as follows. We would ask the court to bring this jury into liberation. Now that you've now stopped. We want you to bring them back into the courtroom. The commonwealth is closed and we want you judge to give them another charge. And here's what we want you to tell them. We would ask that the court call to the attention of the jury. The fact that there are forged documents in front of them. That the two forged documents suggest that there is evidence of guilty knowledge. And take into account the fact that the documents themselves reflect an attempt by the defense to perpetrate a fraud on the court. Sure, that may have been what the Commonwealth wanted to say. But you were free. Talking about you, the defense generally. I don't know what your piece in this at the trial was. But the defense was free to say, well, let's have an instruction. But not that instruction. You know, if you want to identify for the jury that there's a problem here with these documents. Okay, but don't call mistrial. In fact, the request was the opposite. It was, don't give them an instruction. We'd rather have a mistrial than that. How can the trial judge be faulted for that, for acting on that? The option of giving them a directed verdict of guilt was no option. Understood. You understood. I know you do, Judge. You've tried them. Now, what I went on to say is we want this jury to render its verdict based solely on the evidence presented. We are asking that their deliberations resume immediately. And we are opposed to a mistrial. That's pretty clear. If a mistrial is granted, then we'll let the appellate courts deal with the double jeopardy issue. And here we are. Here we are. Now, I'll give you a moment to sum up. Your Honor, the documents that triggered this mistrial after 30 days were non-nefarious, irrelevant, immaterial to the case at hand, and there was no manifest necessity to terminate that proceeding of 30 days and put her through a second trial. I know you're over time, but I did want to make sure to ask a question about compulsory process and the evidence. I like that issue. So here's my question. There's a lot of evidence that people worked many more hours than they needed to. Correct. There's a lot of evidence that they had the ability to take comp time. Correct. And there is some testimony in the record that people specifically scheduled some comp time on October 29th, November 3rd. They went out for specific election days. I've been looking, and I can't find anything in the record that shows someone actually going to Audrey, what's her name, and saying, I want to schedule some comp time to do campaign work in the office, or that someone says, I did that. Can you cite any specific volume or page number in the record of someone actually saying, yes, I used this comp time to do this work in the office? Oh, the record is replete. Cite your best two examples to me. The best two examples would be from a staffer by the name of Lund, L-U-N-D. And she made it clear that what page, what volume, where in the record. The specific record reference. Rand Lund would be Appendix 539A. The chief of staff, Jamie Pabla, testified that she gave the Commonwealth more than 20 hours a week of overtime for 15 years. I know she worked it. But your theory at the moment, and this is in your reply brief at 22, seems to be they piled up so many hours that anything they did in the office was necessarily on comp time. But that's not the way comp time works, according to the witnesses. The evidence was you had to go to the coordinator of the comp time and write it down and schedule it. And so just saying Pavlov worked a whole bunch of extra hours is not enough for your defense. Your Honor, I respectfully disagree. There is no requirement that there be office records kept on comp time. Jane Orrey wanted it that way. But if I have... Your defense depends on finding that whether or not any records were kept or anything was written down or reported, just necessarily there's so many extra hours that it's all taken care of in the comp time. No. Not whether there's records. Whether the jury believed, based on the testimony of the witnesses, whether they believed that these witnesses voluntarily used their comp time to do campaign work. Did they have to go to Audrey Rasmussen in order to use the comp time? Not at all. So this bit about Audrey Rasmussen overseeing comp time at Appendix 481, that's optional? It's optional. It's superfluous. Look, if I had... I've got Sunday off. I've got Sunday off. I don't have to go tell Audrey Rasmussen what I'm going to do. I've got three days vacation and I can take Monday, Tuesday, and Wednesday off. I don't have to tell her how I'm going to use it. If I want to take my kids to the beach, I can. If I want to take my wife to a resort, I can. If I want to put yard signs out for my employer so I can get a job after the election, that's my business. And that's the defense. What made the district court's ruling to the contrary saying, you know, there's no finding a specific use of comp time objectively unreasonable? They got it wrong, and that's why we're here. Okay. All right. Thank you, Mr. Kasatos. We'll have you back on rebuttal. And we'll hear from the Commonwealth. May it please the court, my name is Ronald M. Wabi, Jr. I'm a deputy district attorney in Allegan County. I represent the appellees in this matter. Okay. I don't know which issue you'd like me to address first. But regarding the actual ‑‑ If you would, you could start with the double jeopardy argument. Okay. You want to explain to us why Mr. Kasatos is wrong in the assertion that this was an overreaction, and in fact, speak directly to the point made in the briefing that the DA timed this. You had these documents. You had them for a long time. If you'd seen a problem with them, you could have brought it up. In fact, you used them in trial. And then waiting until the jury is midstream to bring it up was strategic and falls on you, not on ‑‑ shouldn't fall on her. I take that to be the pitch. Okay. Your Honor, what I would say to that is Judge Manning, who was the trial judge, found that the exact opposite. He said that the Commonwealth did not get these discovery documents until late in the game. So they were put into trial by the defense at a late point in the case. So the Commonwealth didn't have the opportunity to examine them. In fact, when the witnesses were confronted with those signatures, they didn't see those documents before, they didn't see them before, and things like that. So when the Commonwealth had a chance to review the documents while the jury was deliberating, that's when they discovered this. Did the government not have an opportunity? I mean, on what day did those documents surface? I believe that the original documents were made late in the trial. I don't know the specific date. And it was two days into the deliberation before they determined that was ‑‑ So what prevented ‑‑ I mean, if these documents were so obviously forged, you look at them and you go, holy smokes, this is a fraud, what explains that gap? I mean, they've got an explanation. The explanation is a nefarious one. But what's your explanation? I would say ‑‑ I wasn't the trial attorney, okay? I would say that it could have been inadvertence. Maybe he didn't look at it as closely. He saw it was a signature, didn't look at it that closely. He goes back, he's thinking about what the jury's thinking about it, and then looks at it more closely and sees it. I mean, it's one of those things where they flash on the screen, you put the ‑‑ It happens in every case. You say, is this your signature at the bottom? Somebody looks at it and goes, oh, yeah, it looks like mine. That's true, but in every case you don't have a mistrial declared for forgery. I mean, you've got to acknowledge this is a pretty unusual set of circumstances, right? I absolutely acknowledge that. Okay. So then that manifest necessity door is the one the Commonwealth has to go through to save this from being double jeopardy, right?  And she's not to be punished twice because you had your shot. That is the way it works, right? Absolutely. Okay. So then I put it to you, if it was so shocking, these documents, that it required stopping the jury midstream, why wasn't it shocking enough to prompt action by the Commonwealth before the jury was put to work? Like I said, Your Honor, they received those documents late in the trial. It happened late in the trial, and like I said, I can't explain why he sat on it as long as he did. If he didn't notice it immediately, those are matters of the record. So when he noticed it, he told the trial judge, and the trial judge is who made the determination, based upon what he saw before it. And here's the thing. There were options. It wasn't like the trial judge said, look, it's a mistrial. It's over. Okay? First, they offered the jury instruction option the Commonwealth offered. Defense refused that. Defense initially asked. It wasn't a great offer. I mean, he read, Mr. Cosopolis just read us the instruction that the Commonwealth wanted, which this sounded a lot like, and find this person guilty. And I'm certain that the trial judge would have modified it and made something more palatable to the defense if it was a viable option. So there's that option. Mr. Cosopolis and the defense asked for a mistrial initially. They discussed it. Then when the time came, the judge, instead of relying on his own view of the documents, he brought somebody independent in to look at those documents to confirm they were, in fact, a forgery. They were a cut-and-paste job. So at that point in time, the judge is faced with a decision. Do I give him an instruction? The defense doesn't want an instruction. So do I let this case continue to deliberate with evidence that I now know is to be false, or do I declare a mistrial and let the case begin again? And that's the option the judge took. And I think when you have a fraud on the court of this magnitude, that was the only option it was faced with. And we're not talking about documents that were later determined to be indeterminately attached to her. She was later convicted of forging them. And the assertion that your learned co-colleague is making is that these documents were really, they weren't a big deal. These were minor points. What's your answer to that, that this was much ado about nothing? The defense was, by the appellant, was that I was the person who helped craft the ethics rules. I was the person who reviewed all these matters. And I made it clear there was supposed to be no political work done on my time. Her defense was, I actually made a directive. I actually made sure none of this happened at the office. So when our witness, Jamie Pavlett, who says, oh, all this political work, all this campaign work was done on our time, and then she's confronted with those letters, it attacks her credibility. It makes it look like the appellant, the defendant, is saying, my defense was I'm not responsible because I told them not to do it. And here I have written directives that say it. And she signed it, and she knows that that wasn't true. And so that was their defense. And that's what made those documents important. Okay. Let's shift gears for just a moment, if my colleagues will allow me, and talk about Mr. McNutt's excluded testimony. In your briefing, you say that that was presented largely as a state law claim in the state and the district court. And yet, you also said that it was exhausted and not procedurally defaulted, that claim. Right? Correct. So you've waived any assertion as to exhaustion and procedural default in that regard, right? So we have to go to the merits on that claim? My only problem with that was this, was when it was presented at the district court level, it did look the same. And then it changed when it got to the Third Circuit. So it went from looking more like a state law evidentiary claim to making a turn into compulsory due process. So that is why I assert that. And that's my point of view, is that the claim kind of morphed. It may have morphed, but if you've said it was, and you did say it's not, it is exhausted and it's not procedurally defaulted, that puts the court in the posture then of needing to address the merits, right? Correct. Okay. I agree with you. I was explaining to myself as to why that happened. Okay. On the not in custody piece of this, do you have anything to add to the briefing argument that you made? I do not. And I'll cover it again, two arguments from now. It's the same argument, is that if you're not in custody, it doesn't matter if there's collateral consequences. This Court's most recent decision reiterated the idea that it has to be some type of custody. It can't just be other collateral consequences in life that create custody. Do you have any response to Mr. Costopoulos' assertion that comp time didn't require any record keeping or any kind of designation? Your Honor, you were correct. There is no record that's going to show what you want. You asked his question. There is no record of this comp time being recorded. And also a point of note with that is that it doesn't really matter. Because when the defendant testified, she said no time was used for political activity. So it doesn't matter if it was comp time. It doesn't mean it was paid time. Her defense was, I never allowed it, period. So this idea that comp time or whether or not comp time was a viable thing or whether it was allowed under the rules doesn't matter because her testimony was, it wasn't supposed to happen anyway. So her entire defense is built on, I am not doing these activities at work. I don't care what my people say. Thank you. Thank you very much. Mr. Robby, we'll hear from Mr. Costopoulos. By way of rebuttal, Your Honors, you asked about when the Commonwealth had the documents. The mistrial was declared on or about March 3rd. Jamie Pavlat was testified on cross-examination on or about February 23rd. And that's when I was putting them right in front of her. And that's when they would take them and photocopy them. They had them. They got a second set of copies on the 24th. And they came up with a document that the lower court found as follows. Ray Charles could see this. And I agree with him. That's how bad it was. That's how dumb it was. That's how non-nefarious it was. Ray Charles could see it. And I had 12 jurors in the box for 30 days. And all of them could see very well. And we got mistrial on that. Period. And I will end my presentation with a question for the panel. And it goes something like this. If you have vacation time coming. And you don't record it. And you don't put it in a book. And you don't report it to anybody. And you decide to go into your office in Allegheny County or Harrisburg on a Sunday. On your own time and make calls on your own cell phone. Is that a felony? That's what this case is all about. That's what the defense was. It was not what the prosecutor suggested. That's what the defense was. And we were denied that defense by not being allowed to call the 32-year chief counsel to the Senate to say you can do that. And I say to this panel, you can do it today. Thank you. Thank you very much, Mr. Christopoulos. Mr. Wabi, we've got that case under advisement.